## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| ANY LUCIA LOPEZ BELLOZA,<br><br>Petitioner,<br><br>v.<br><br>PATRICIA HYDE, Field Office Director,<br>MICHAEL KROL, HSI New England Special<br>Agent in Charge, TODD LYONS, Acting<br>Director U.S. Immigration and Customs<br>Enforcement, KRISTI NOEM, U.S. Secretary<br>of Homeland Security, PAMELA BONDI,<br>U.S. Attorney General, DONALD J. TRUMP,<br>President of the United States,<br><br>Respondents. | Case No. 1:25-cv-13499-RGS |

## MEMORANDUM OF LAW IN OPPOSITION TO RESPONDENTS'
## MOTION TO DISMISS

**INTRODUCTION**

Respondents detained Petitioner Any Lucia Lopez Belloza, a then-19-year-old (now 20-year-old) college student, while she was on the way home to surprise her family for Thanksgiving. While her family was working to engage counsel, and while that counsel was working to locate Any, Respondents moved her from Massachusetts to Texas. But the ICE locator website that is supposed to tell the outside world where a detainee is located did not reflect that change, and Respondents denied Any's repeated requests to make any additional phone calls. Any's counsel therefore filed her habeas petition in this District—her last known place of confinement—at a time when the *only* people who knew her location were Respondents and the only public information about Any's location was that she had been in Massachusetts mere hours before. Before anyone heard from Any again, Respondents flew her to Honduras, in admitted violation of an order of this Court.

Despite these troubling facts, and despite Respondents' role in causing them, Respondents took the position that the habeas petition was filed in the wrong court under the usual, district-of-confinement rule. And although this Court has expressed its dismay at Respondents' violation of a court order—and their unwillingness to voluntarily remedy it—the Court has adopted that same conclusion. Respondents now ask this Court to dismiss Petitioner Any Lucia Lopez Belloza's habeas petition because this Court has "repeatedly found" that it "lacks habeas jurisdiction over the Petition because it was filed after Petitioner departed from Massachusetts." Doc. No. 52 ("MTD"), at 2.[1]

This Court should deny the motion. The Court has previously found that the unknown-

---

[1] As the Supreme Court has explained, "[t]he word 'jurisdiction,' of course, is capable of different interpretations." *Rumsfeld v. Padilla*, 542 U.S. 426, 434 n.7 (2004). Petitioner understands this Court (and Respondents) to "use it in the sense that it is used in the habeas statute, 28 U.S.C. 2241(a), and not in the sense of subject-matter jurisdiction of the District Court." *Id*.

1

custodian exception to the district-of-confinement rule applies only where "the government deliberately and in bad faith holds a detainee incommunicado or shuttles her from place to place with the explicit purpose of preventing her from seeking habeas relief or manipulating jurisdiction." Doc. No. 37, at 7 n.5. But as numerous courts have recognized, that is incorrect: even though this record would support a finding of bad faith, the unknown-custodian exception does not require it. Rather, it applies "where the Government [is] not forthcoming with respect to the identity of the custodian and the place of detention." *Padilla*, 542 U.S. at 454 (Kennedy, J., concurring). That standard is surely met here, and Petitioner therefore seeks reconsideration of the Court's prior jurisdictional holding.

Respondents' motion is part and parcel of the government's continuing efforts to evade any opportunity for *any* court of law to review Any's claims—or, in this Court's words, to "arrogate to itself" the legality of Any's detention and removal. Doc. No. 42 ("Feb. 13 Order") at 7. Even after this Court rejected Respondents' contention that return to the United States would be "futile because 'it would merely result in subsequent detention and removal again to Honduras,'" *id.* at 6 (quoting Doc. No. 41, at 4), and ordered that Respondents facilitate her return to the United States, Respondents made abundantly clear that in purporting to comply with this Court's order, they intended to return Any to Texas only to detain her and promptly remove her again. Doc. No. 52, at 3. In the same breath, Respondents confirmed their own position that Any's return to the United States *would* be futile, because (in Respondents' view) no court would have jurisdiction to stay Any's removal even long enough to hear her claims. *Id.* at 3–4. And *even after Respondents had notified this Court* of "ICE's intent to effectuate Petitioner's final order of removal after she is returned to the 'status quo that existed when ICE effectuated her final order of removal,'" *id.* at 3, the ICE agent that Respondents sent to shepherd Any's return to the United States attempted to

lure her into that trap by telling her that she would "likely" be released into the United States upon her return—something that Respondents' counsel had already confirmed, in a signed submission, was untrue. *See infra* at 9–10.

It is intolerable for our government to treat people this way. Unfortunately, Respondents' efforts to cajole Any into springing their jurisdictional trap with representations that were already established to be false by their own court filings are of a piece with their overall strategy in this case: to send a college student to Honduras, a place she has not lived since she was 8 years old, without any opportunity for judicial review of her legal claims. Fortunately, this Court *does* have jurisdiction over *all* of her claims.  The Motion to Dismiss therefore should be denied.[2]

## BACKGROUND

### A. Factual Background

In 2014, when she was eight years old, Any entered the United States through Mexico without inspection.  She was arrested by ICE officers on December 13, 2014, and subsequently released on her own recognizance on December 14, 2014.  Doc. No. 1 ("Petition"), at ¶ 20–21.

Respondents contend that in 2017, when she was around eleven years old, Any was ordered removed without her personal knowledge.  Doc. No. 16-1 at 2.  As far as Any's counsel is aware, there is no record that a warrant for Any's removal was ever issued, including as of this date.  Since

---

[2] Petitioner vigorously disagrees with the Court's holding as to habeas jurisdiction, and she intends to contest that holding, if necessary, on appeal to the First Circuit. But if this Court remains unwilling to reconsider its jurisdictional holding (*see* Order of February 27, 2026, Doc. No. 55), then Petitioner agrees that this Court should now enter a final, appealable judgment and allow an appeal to proceed forthwith.  Any's other claims invoke other causes of action, such as the APA. *See* Petition ¶¶ 35-53. Respondents do not address those claims in their motion to dismiss, but Petitioner infers that Respondents' position would be that those claims are subject to the same venue requirements under *Trump v. J.G.G.* because they "necessarily imply the invalidity of" Any's "confinement and removal." 604 U.S. 670, 672 (2025) (per curiam) (citations and internal quotation marks omitted). Although Petitioner disagrees that *J.G.G.* is relevant here, if the Court believes that all of Petitioner's claims sound in habeas, they would be subject to the same venue requirements. As a result, if the Court declines to reconsider its holding as to venue, the Petition would be dismissed in its entirety. However, as Respondents have conceded, any such dismissal would not affect the contempt proceedings, Doc. No. 54-5, at 6–7. Further, Respondents ask the Court to vacate its November 24, 2025 Order, *see* Doc. No. 52, at 1. Should the Court deny the motion to dismiss, that request should also be rejected.

then, Any has lived in the United States without incident, and is now a college student on a full scholarship at Babson College in Wellesley, Massachusetts. Doc. No. 16-1 at 1; Doc. No. 37, at 3.

On November 20, 2025, Any went to Logan International Airport to board a flight to Texas and surprise her parents with a visit for Thanksgiving. At around 5:30AM—all times are Eastern unless otherwise noted—she was met by two plainclothes officers at the gate, arrested, and detained. She arrived at the Boston Field Office around 6:00AM. Doc. No. 16-1 at 1–2.

Any's phone was confiscated, along with her wallet and other items, after arriving at the Boston Field Office. When an officer arrived at 7:00AM with breakfast, Any requested a phone call, but the officer denied her request. Doc. No. 16-1 at 2.

Another officer came around 7:30AM to speak with another detainee. Any asked for a phone call, and an officer again denied her request. Doc. No. 16-1 at 2.

At around 8:30AM, an officer led Any to a desk and asked her a series of questions. Any asked a third time for a phone call and told the officer that her parents did not know where she was. Once again, the officer denied her request. Doc. No. 16-1 at 2.

A supervisor then arrived, and Any informed her that Any's family did not know where she was. Any requested a phone call; for the fourth time, that request was denied. Doc. No. 16-1 at 2.

Any was then told that she had a deportation order from 2017, of which she was not aware. Officers pressured her to sign a form consenting to her deportation, but she said she would not sign anything until she spoke with her parents and a lawyer. Doc. No. 16-1, at 3.

Any was finally granted a phone call around 10:56AM. She called her father and informed him that she was detained at the Boston Field Office. After the call, she was returned to her holding

4

cell, where she suffered a panic attack. Any was subsequently provided a list of attorneys; although she called all five lawyers who were listed, none answered. Doc. No. 16-1 at 3.

Any requested a second call in the afternoon, and she was allowed to call her mother at around 2:02 PM. Any's mother told her that they were going to try and get her out, but needed to confirm where Any was located. Her mother requested her A number, but officers denied Any's request to see her paperwork and retrieve this number. Doc. No. 16-1 at 3.

Instead, ICE officers informed Any that her family could use the ICE Detainee Locator with her name, date of birth, and country of origin. Any called her father, and he said they were trying to get an attorney. This was the last phone call Any was permitted to make while in the United States. At the time she made these phone calls, Any had "no idea" that she would be transferred out of Massachusetts—and thus could not have conveyed that information to her family. Doc. No. 16-1 at 3, 5.

Before 7:00AM the next morning (Friday, November 21, 2025), officers told Any to get ready to leave. Any asked to call her parents and inform them she was being transferred, but she was never permitted to do so. Instead, Any was handcuffed, her feet were shackled, and she was placed into a van, where she and four other detainees were driven to a military airport about fifteen minutes away, where they waited for a few hours. Doc. No. 16-1 at 3–4.

Any's family had engaged counsel on Thursday night around 10:30 or 11:00 p.m., Doc. No. 39, 8:21–25, although no one was able to communicate this information to Any.[3] Meanwhile, Any's attorneys attempted to locate her. On Friday morning, when Any's attorneys checked the ICE Detainee Locator at 8:33 a.m., it listed her current detention facility as "Call ICE For Details" and listed the assigned ERO office as "BOSTON, MA, DOCKET CONTROL OFFICE." Based

---

[3] The Court's January 16, 2026 order stated that Any's counsel was engaged in the afternoon of November 20, 2025, but that is inaccurate. *See* Doc. No. 37, at 4.

5

on their "extensive prior experience with similar situations," they understood that this meant Any was being held at the ICE facility in Burlington, Massachusetts.  Doc. No. 16-2 at 1.

At 9:37AM, Any's counsel filed their G-28, Notice of Entry of Appearance as Attorney or Accredited Representative, for Any via the ICE ERO E-File website.  At 9:38AM, her counsel called the Boston Field Office's phone number, and was greeted with an automated message.  The call automatically terminated after this message was completed.  Doc. No. 16-2 at 1–2.

Any's counsel then called every major known ICE detention facility in New England, and each one told her that Any was not being held at their facility.  Counsel checked the ICE Detainee Locator again at 10:05AM, and it still said that the assigned ERO office was "BOSTON, MA, DOCKET CONTROL OFFICE."  It then directed her to call the same number she had tried earlier, which had played the automated message and automatically hung up.  Doc. No. 16-2 at 2.

At or around 12:30PM, Any was placed on a plane.  She was not informed that an attorney had filed an appearance on her behalf.  She was not told where she was going until about halfway through the flight, when officers informed her that they were flying to Texas.  Doc. No. 16-1 at 4.

At around 3:44 PM, Any's father called her counsel and told her that Any was no longer appearing in the ICE Detainee Locator.  Doc. No. 16-2 at 2.

At 4:48 PM, the plane carrying Any landed at an airport in Harlingen, Texas.  Doc. No. 27-1 at 2.  When counsel checked the ICE Detainee Locator at approximately 5:30 PM, Any's information returned "Search Results: 0."  Doc. No. 16-2 at 2.

Meanwhile, after the plane carrying Any landed in Texas, Any waited on the plane for about an hour. March 5 Declaration of Any Lucia Lopez Belloza ("Lopez Belloza Decl."), at 1. Eventually, her name was called, and she was taken onto a bus.  Doc. No. 16-1 at 4. She was one of the last people to be called off the plane. Lopez Belloza Decl. at 1. By the time Any was on the

bus, it was dark outside. *Id.* The bus ride lasted 30-60 minutes before arriving at the Port Isabel detention facility. *Id.* at 1–2. After another wait, Any was called off the bus and booked into the facility. By the time she was eating dinner, it was around midnight local time. *Id.* at 2.

A few minutes before 8:30 p.m. Eastern Time, Any's counsel received an email notification that there was an update concerning Any in the ICE locator. Affidavit of Nicole Dill, Esq. at 1. Any's counsel checked the locator and saw two entries listed for Any, showing that she had been checked into the "Port Isabel SPC" facility at two different times on November 21, 2025. *Id.* The earlier of the two listed times was 8:25 PM. *Id.* This was the first indication Any's counsel received that she had been transported outside of Massachusetts.

By that time, Any's counsel had already filed a habeas petition in this District—the last place she was known to be. The petition was filed at 6:00 PM Eastern Time. Ten minutes later, the Emergency Judge issued an order barring Respondents from transporting Any outside of this District or the United States. Doc. No. 2, at 1–2; Doc. No. 37, at 5.

ICE was aware of and received this order minutes after it was entered. Doc. No. 27-1, at 3. The ICE officer responsible for implementing the order says that he believed that it did not apply because Any had already been moved out of Massachusetts. *Id.* He now says this was a mistake. *Id.* At a minimum, therefore, ICE did not put in place the appropriate internal processes that would have prevented Any's removal from the United States. *Id.*

At the Port Isabel Detention Center, Any was again constructively denied a phone call because she had to wait until the male detainees—of which there were around thirty—had their calls first. Doc. No. 16-1, at 4. She was moved to another cell with three other female detainees, where she was again denied a phone call because the men had to use the phones first. *Id.* Any was not permitted to make a call that day. *Id.*

At around 3:00AM on Saturday, November 22, 2025—less than forty-eight hours after she was arrested at Logan International Airport—Any was placed on a bus and sent back to an airport. Doc. No. 16-1, at 4.  After waiting for two hours on the bus, she was put on a plane that took her to Honduras.  *Id.*  She arrived in the afternoon.  *Id.*  All in all, Any "was never allowed a phone call after being informed [she] would be transferred out of Massachusetts, never allowed a call when told [she] was going to Texas, and never allowed a call while detained in Texas."  *Id.* at 5.

After Any arrived in Honduras, she was finally able to contact her family.  Doc. No. 16-1, at 5.  She then learned for the first time that counsel had been engaged and had tried repeatedly  to reach her.  *Id.*

## B.  Procedural History

On December 4, 2025, Respondents filed their opposition to the habeas petition. Respondents contended, *inter alia*, that this Court lacked jurisdiction over the petition and that in any event, Petitioner "ha[d] obtained the only relief available in habeas—release from executive custody via ICE's effectuation of her final order of removal to Honduras which occurred on November 22, 2025."  Doc. No. 8, at 3.  Remarkably, in making that (incorrect) legal assertion, Respondents did not even *acknowledge* that they had removed Any in violation of a court order. *See Leitao v. Reno*, 311 F.3d 453, 455–56 (1st Cir. 2002) (removal does not moot a habeas petition).  Petitioner pointed this out in reply, see Doc. No. 16, at 5, and Respondents then first "acknowledge[d]" and expressed "sincere[] regret that ICE failed to comply with the Court's November 21, 2025 Order" barring Any's removal from the District or the United States.  Doc. No. 27, at 2.  Respondents nonetheless urged this Court to take no action, on the theory that the "violation of the No Transfer Order was inadvertent, occurring due to the mistaken understanding of the import of such Order" by an ICE officer.  *Id.* at 3.

8

On January 16, 2026, this Court entered an order giving Respondents the opportunity "to rectify the mistake [they] acknowledge[] having made in Any's case before contemplating the issuance of any further order." Doc. No. 37, at 9. On February 6, 2026, Respondents declined to voluntarily return Any to the United States. Doc. No. 41. Subsequently, this Court issued an order that Respondents "facilitate Any's return to the United States no later than fourteen (14) days from" February 13, 2026, "*i.e.*, no later than February 27, 2026," and file status reports on February 18 and 26. Doc. No. 42, at 7 (emphasis in original).

Respondents filed the first required status report on February 18, 2026, stating that they were in receipt of the Court's order and had "requested and obtained a copy of Petitioner's passport." Doc. No. 51, at 2. This was supported by a declaration from an officer located in Burlington, Massachusetts. Doc. No. 51-1, at 1. On February 25, 2026, Any's counsel reached out to Respondents' counsel for an update. Doc. No. 54-5, at 7. Respondents' counsel informed Any's counsel that they would file a motion to dismiss the Petition, and that they had arranged a flight to depart from Honduras. *Id.* at 6–7. Respondents' counsel did not answer Any's counsel's repeated questions about where Any's flight would land in the United States. *Id.* However, on February 26, 2026, an ICE officer informed Any that her flight would be to Harlingen, Texas. Lopez Belloza Decl. at Exh. A; Affidavit of Translation of Rachel Weber ("Aff. of Translation") at Exh. A. That same day, Respondents also filed a status report stating that her flight was to arrive in Harlingen, Texas. Doc. No. 53, at 2. This status report was supported by a declaration from an officer located in Burlington, Massachusetts. Doc. No. 53-1, at 1.

Also on February 26, Respondents filed the Motion to Dismiss, in which they provided "advance notice of ICE's intent to effectuate Petitioner's final order of removal after she is returned to the 'status quo that existed' when ICE effectuated her final order of removal"—*i.e.*, custody in

9

the United States.  Doc. No. 52, at 3; *see also* Doc. No. 4 (requiring 72-hour notice before removing Any from the United States).  Respondents further asserted that *no* court could stop them from taking that action.  Doc. No. 52, at 2–3. On the evening of February 26, 2026, Petitioner filed an emergency motion asking this Court to clarify whether Any was to return to Massachusetts or Texas.  Doc. No. 54.  The Court denied the motion without prejudice.  Doc. No. 55.

On February 27, 2026, Any provided notice that, in light of Respondents' intention to fly her to the Southern District of Texas, detain her, and immediately remove her again, she did not board the flight.  Doc. No. 56, at 2. She also notified the Court of her intent to file a response to Respondents' motion to dismiss by March 5, 2026.  *Id.* Respondents confirmed that Any did not board the flight.  Doc. No. 57, at 1. Once again, they supported this with a declaration by an officer located in Burlington, Massachusetts.  Doc. No. 57-1, at 1.

## ARGUMENT

**I.    Jurisdiction and Venue Are Proper in the District of Massachusetts.**

### A. The Unknown-Custodian Rule Applies.

Although Petitioner understands that this Court has previously held that habeas jurisdiction is lacking in this District, Petitioner respectfully submits that is incorrect. Doc. No. 16, at 7–9; Doc. No. 36, at 4–6; Doc. No. 54, at 4–5. At the time Any's habeas petition was filed, Massachusetts was Any's last known district of confinement.  Indeed, to the outside world, there was no reason to think Any had been moved out of Massachusetts—much less any reason to know *where* outside of Massachusetts Respondents might have transported her.  These circumstances fall squarely within the exception to the district-of-confinement rule where a petitioner's immediate custodian (and that custodian's location) are undisclosed.  *See* 28 U.S.C. 2242 (stating that a petition for a writ of habeas corpus "shall allege…the name of the person who has custody over [the petitioner] and by virtue of what claim or authority, if known").

10

As the Supreme Court explained in *Rumsfeld v. Padilla*, 542 U.S. 426 (2004), the general rule is that "the proper respondent to a habeas petition is 'the person who has custody over [the petitioner],'" *id.* at 434 (quoting 28 U.S.C. § 2242), and "in habeas challenges to present physical confinement . . . the district of confinement is synonymous with the district court that has territorial jurisdiction over the proper respondent." *Id.* at 444. Usually, "[b]y definition, the immediate custodian and the prisoner reside in the same district." *Id.* However, the *Padilla* Court recognized that this definitional relationship breaks down in certain circumstances where the immediate custodian is unknown to the petitioner: "When . . . a prisoner is held in an undisclosed location by an unknown custodian, it is impossible to apply the immediate custodian and district of confinement rules." 542 U.S. at 450 n.18.

It is undisputed that, at the time the Petition was filed, Any's location and immediate custodian were undisclosed.  This Court previously found that Respondents' failure to make either of those facts available was immaterial simply because "Any's petition was filed after she had arrived at the detention center in Port Isabel." Doc. No. 37, at 7.[4] But under *Padilla* and the First Circuit's decision in *Vasquez v. Reno*—along with numerous district courts that have begun to confront this issue in the context of rapid, undisclosed movements of ICE detainees around the country—Any's Petition was properly filed in the last known place of confinement because "despite . . . best efforts, Petitioner's counsel didn't know who had custody of Petitioner" at the time of filing, or where that custodian was located. *Van Tran v. Hyde*, No. 25-CV-12546-ADB, 2025 WL 3171210, at *3 (D. Mass. Nov. 13, 2025) (Burroughs, J.). Moreover, this case is not like *Trump v. J.G.G.*, 604 U.S. 670 (2025), where petitioner's location was undisputedly in Texas. *See*

---

[4] As discussed further below, to the extent this Court's holding was based on its understanding that Any's Petition was filed after she had arrived the Port Isabel facility, that factual assumption was mistaken (and unsupported by the then-existing record). *Infra* at 16–17.

*Trump*, 604 U.S. at 671–72; *but see* Doc. No. 37 at 7 (this Court previously found *J.G.G.* to be "very much in point").

> As another court in this district has explained on materially similar facts, Petitioner's
>
> attorney filed the Petition in the district where she last knew him to be, which was also the district in which he was taken into custody. She had endeavored to ascertain whether he had been removed from Massachusetts but had been unable to obtain the information. Even if she had understood that he was likely to be removed from Massachusetts to another jurisdiction, she had no way of knowing that his new location would be in New York. Thus, she filed the Petition in the only location that made any sense in the moment.

*Van Tran v. Hyde*, 2025 WL 3171210, at *3.[5] In these circumstances, regardless of Petitioner's actual location, the proper venue for a habeas petition is the district with jurisdiction over the last custodian of which the government made Petitioner aware. *Id.* at *4 (collecting cases); *see also Suri v. Trump*, 785 F. Supp. 3d 128, 149 (E.D.Va. 2025) (denying dismissal and transfer where, as here, petition was filed in petitioner's last known location), *aff'd*, No. 25-1560, 2025 WL 1806692 (4th Cir. July 1, 2025); *Tah L. v. Trump*, No. 26-cv-171, 2026 WL 184524, at *4–5 (D. Minn. Jan. 19, 2026) (*report and recommendation adopted in relevant part by* No. 26-cv-00171, 2026 WL 184529) (where petitioner was detained in Minnesota and subsequently transferred, and her counsel did not know her whereabouts, Minnesota was the proper habeas venue); *Adriana M.Y.M. v. Easterwood*, No. 26-cv-213, 2026 WL 184721, at *3 (D. Minn. Jan. 24, 2026) (denying motion to transfer where petitioner was detained in Minnesota and transferred to Texas without disclosure to petitioner's counsel).

Any other rule would create a road map for the government to evade habeas jurisdiction until it is too late—a result at odds with the Great Writ's historical function as a limit on unchecked executive power. As the Fourth Circuit explained in *Suri*, "[t]he unknown-custodian exception is

---

[5] Judge Burroughs also issued the November 21, 2025 order prohibiting Any's removal from the United States that was violated in this case. Doc. No. 2.

critical because a detainee must *always* have an available forum for a habeas petition, even if the government doesn't disclose their location. . . . Put another way, there is no gap in the fabric of habeas—no place, no moment, where a person held in custody in the United States cannot call on a court to hear his case and decide it." *Suri*, No. 25-1560, 2025 WL 1806692 (4th Cir. July 1, 2025), at *5 (emphasis added) (internal quotation marks omitted).

In *Suri*, on analogous facts, the government contended that because the petitioner was "awaiting check-in" at a detention facility in Louisiana, "his immediate custodian was the director of that facility." *Id.* (internal quotation marks omitted).  But as far as the petitioner or his counsel were aware, the petitioner was still in Virginia, because that was the information that the government had permitted to become public—conveniently withholding the new development that the petitioner was being moved to Louisiana. *Id.*  The Fourth Circuit held that "if the government moves a detainee from a district and their attorney cannot discover their location with reasonable inquiry, that attorney must be able to file a habeas petition in the detainee's last-known location against their ultimate custodian.  Otherwise, that detainee would lack the ability to seek habeas relief as long as the government kept their location and custodian a secret, thus granting 'the political branches . . . the power to switch the Constitution on or off at will,' 'leading to a regime in which . . . the President, not th[e Supreme] Court, say[s] 'what the law is.'" *Id.* at *6 (quoting *Boumediene v. Bush*, 553 U.S. 723, 765 (2008); *see also Padilla*, 542 U.S. at 454 (Kennedy, J., concurring) ("where the Government was not forthcoming with respect to the identity of the custodian and the place of detention . . . habeas jurisdiction would be in the district court from whose territory the petitioner had been removed.").[6]

---

[6] There is no question that Any's attorney made a "reasonable inquiry" into her location before filing the Petition. As this Court acknowledged, Any's counsel made "significant efforts" to learn Any's whereabouts. Jan. 16 Order at 5 n.3; Doc. No. 16-2, at 2; *see also Van Tran*, 2025 WL 3171210, at *1 (where, as here, petitioner's counsel checked the ICE detainee locator system, such efforts alone were sufficient to invoke an exception to the district of confinement

Respondents do not dispute that their own public locator system first indicated that Any was in the District of Massachusetts and then failed to indicate that her location had changed to Texas—or provide any information about her location at all.  *See Ozturk v. Hyde*, 136 F.4th 382, 392 (2d Cir. 2025) (noting government's policy of "not permit[ting] immigration detainees 'to communicate about their location while enroute between detention facilities'") (citation omitted); *see also* Doc. No. 39, at 31:14–23 ("[I]t's not a real-time tracker of the individual.").  Instead, they have argued that this fact is immaterial because there has been no showing of bad faith. This Court agreed, characterizing the unknown-custodian exception as applying "where the government *deliberately and in bad faith* holds a detainee incommunicado or shuttles her from place to place *with the explicit purpose* of preventing her from seeking habeas relief or manipulating jurisdiction." Jan. 16 Order at 7 n.5 (emphases added).

Petitioner respectfully submits that this description misstates the relevant standard. There is no requirement—under *Padilla*, *Vasquez*, or logic—that a petitioner show that the government withheld information about her location in bad faith or acted with the "explicit purpose" of frustrating jurisdiction.  Instead, Justice Kennedy explained in his concurrence in *Padilla* that the unknown-custodian exception should apply "if there is an indication that the Government's purpose in removing a prisoner were to make it difficult for his lawyer to know where the habeas petition should be filed, *or* where the Government was not forthcoming with respect to the identity

---

rule).  Respondents err in attempting to fault Any's counsel for not filing a petition "within hours" of her detention. Doc. No. 27, at 9.  The right to file a habeas petition seeking relief from ongoing unlawful detention does not expire; and where, as here, "counsel worked diligently and within one day of her arrest filed the Petition," courts have found that petitions were properly filed in the last known district of confinement. *See Tah L. v. Trump*, No. 26-cv-171, 2026 WL 184524, at *4 (D. Minn. Jan. 19, 2026); *Munoz-Saucedo v. Pittman*, 789 F. Supp. 3d 387, 391 (D. N.J. 2025) (petitioner detained on March 28, 2025, and petition filed April 2, 2025); *see Tacuri ex rel. Guanoluisa v. Francis*, No. 25-cv-07012, 2025 WL 3459377, at *1 (S.D.N.Y. Dec. 2, 2025) (petitioner detained morning of August 21, 2025, and petition filed late evening August 22, 2025); *see generally Harris v. Nelson*, 394 U.S. 286, 291 (1969) ("The very nature of the writ demands that it be administered with the initiative and flexibility essential to insure that miscarriages of justice within its reach are surfaced and corrected.").

14

of the custodian and the place of detention." *Padilla*, 542 U.S. at 454 (Kennedy, J., concurring) (emphasis added). As that language makes clear, either condition suffices; bad faith is not required.[7] *Accord Suri*, 2025 WL 1806692, at *6; *Van Tran*, 2025 WL 3171210, at *3. Similarly, *Vasquez* recognizes an exception for "furtiveness" that is stated in the disjunctive alongside the independent bad-faith requirement, recognizing that regardless of the government's bad faith, where the government makes it unduly difficult for the petitioner's attorney to know where the petitioner is being held, the appropriate venue is the last known district of confinement. *Vazquez*, 233 F.3d at 696. Nor should these decisions be considered to exhaust the potential situations in which the unknown-custodian exception could apply: "If there is little case law applying the unknown-custodian exception, that is because the government has rarely resorted to such tactics in the past." *Suri*, 2025 WL 1806692, at *5; see p. 12, *supra* (discussing recent district court cases holding the exception met and discussing *Vasquez* without requiring a showing of bad faith).

A requirement of bad faith would create a gap in the fabric of habeas where a petitioner cannot demonstrate bad faith but is nonetheless deprived of the ability to file a habeas petition. *Cf. Ozturk v. Hyde*, 136 F.4th 382, 393 (2d Cir. 2025) (explaining that "the practical effect" of the government's "extraordinary proposition" is "that for some unspecified period of time after detention—seemingly however long the government chooses to take in transporting a detainee between states or . . . facilities—a detainee would be unable to file a habeas petition at all, anywhere."). And it would be extremely difficult to apply in practice. Take the facts of this case. The government quickly moved petitioner from Massachusetts to Texas (and then to Honduras in violation of a court order); it did not tell her where she was being sent; it denied her repeated

---

[7] The *Padilla* majority had no reason to address the contours of the unknown-custodian exception: It explained that "[t]he only reasonable inference, particularly in light of Padilla's failure to argue to the contrary, is that counsel was well aware of Padilla's presence in South Carolina when she filed the habeas petition" in the Southern District of New York. 542 U.S. at 449 n.17; see *id.* at 454 (Kennedy, J., concurring).

requests to contact her family and inform them (or her lawyer, who she did not even know existed) of the transfer; and it caused the ICE locator—the *government's own public record of detainees' locations*—to stop showing Any's location. Doc. No. 16-2, at 2. Those actions support at least an inference of bad faith. *See Ozturk v. Trump*, 777 F. Supp. 3d 26, 40–41 (D. Mass. 2025) (finding that the government acted in bad faith when petitioner "was not permitted to communicate her whereabouts as she was transported from Somerville, Massachusetts to Methuen, Massachusetts to Lebanon, New Hampshire and then to Saint Albans, Vermont."). And even if they did not rise to that level, the "practical effect" would be exactly the same: Any's counsel did not (and could not reasonably) know where she was. *See Farah v. INS*, No. 02-cv-4725, 2002 WL 31828309, at *3 (D. Minn. Dec. 11, 2002) (finding it irrelevant whether government "intentionally tried to manipulate jurisdiction" and noting that a contrary rule would allow the government "to forum shop, intentionally or not"); *De Jesus Paiva v. Aljets*, No. 03-cv-6075, 2003 WL 22888865, at *4 (D. Minn. Dec. 1, 2003) (similar). Counsel therefore had no choice but to file the Petition in Any's "last-known location against [her] ultimate custodian," *Suri*, 2025 WL 1806692, at *6—and should have been able to trust that, when this Court entered an order barring her transfer or removal a mere ten minutes later, the government would comply.

**B. Independent of the Unknown-Custodian Exception, the Petition Names Any's Immediate Custodian Because Any Was Not Yet Booked Into the Port Isabel Facility at the Time of Filing.**

In holding that it lacked habeas jurisdiction, this Court stated that "Any's petition was filed after she had arrived at the detention center in Port Isabel." Doc. No. 37, at 7. That appears to be a misapprehension of the factual record, because Any had not been "booked into" the Port Isabel detention facility as of 6:00PM ET on November 21, 2025. Instead, after landing in Texas at 4:48PM ET, Any waited on the plane for approximately one hour, waited to board a bus, and then rode to the detention facility. Lopez Belloza Decl. at 1. By the time Any was on the bus, it was

16

already dark outside, *id.* at 1, meaning that it was after sunset local time. The Court may take judicial notice of the fact that sunset in Harlingen, Texas on November 21, 2025 was at 5:39PM local time, or 6:39PM ET.[8] Fed. R. Evid. 201(b). The Court may also take judicial notice that the airport in Harlingen, Texas is about 30 miles from the Port Isabel SPC detention facility, and at least a 40-minute drive.[9] Taken together, these facts show that by the time Any was booked into the Port Isabel detention facility, it was after 6:00PM, likely by several hours.[10] And if there was any doubt, Respondents' *own records* show that Any was not booked into the Port Isabel facility until 8:25 PM Eastern at the earliest. Affidavit of Nicole Dill, Esq. at 1.

In other words, the factual record shows that Any's immediate custodian at the time the petition was filed was not the warden of that Texas facility but the ICE officials in Massachusetts who sent her there—or, alternatively, the officials (or contractors) who operated the flight to transport her from Massachusetts to Texas. [11] *Cf. Suri*, 2025 WL 1806692, at *5 (finding that there was no immediate custodian, and petition was properly filed in the Eastern District of Virginia, where the petitioner was not "booked into" the subsequent facility in Louisiana until "forty-three minutes *after* his petition was filed."). In either event, Any's custodian is named in the Petition: either Respondent Hyde or, to the extent that Any was in the custody of officials (or contractors) with the duty to transport her between Districts, those officials' ultimate supervisor, Secretary Noem. *See Ozturk*, 136 F.4th at 392 ("[T]he naming of a more remote custodian–here, the

---

[8] *See* Time and Date, Harlingen, Texas, USA – Sunrise, Sunset, and Daylength, November 2025 (last visited Mar. 5, 2026), https://www.timeanddate.com/sun/@4696233?month=11&year=2025.

[9] *See* Google Maps, Driving Directions from Valley International Airport to Port Isabel Detention Center (last visited Mar. 5, 2026), https://maps.app.goo.gl/Jkn4hdLHMWW2i3J59.

[10] Notably, in *Suri*, the government submitted a declaration stating the time that the petitioner had been booked into his destination facility. *Suri*, 2025 WL 1806692, at *5. Here, the government submitted no such evidence.

[11] Notably, each of the declarations submitted in this case attesting from personal knowledge regarding the circumstances of Any's detention, removal, and Respondents purported compliance with the Court's order to facilitate her return were submitted by ICE officials located in Massachusetts. *See* Doc. No. 8-1; Doc. No. 27-1; Doc. No. 27-2; Doc. No. 51-1; Doc. No. 53-1; Doc. No. 57-1.

17

Secretary of Homeland Security—satisfies the statutory requirements"); *Suri*, 785 F. Supp. 3d at 141 ("[T]he writ is properly served on the prisoner's ultimate custodian.") (internal quotations omitted) (collecting cases).

## II.    Section 1252(g) Is Not at Issue.

This Court previously held that Section 1252(g) does not deprive it of jurisdiction over the Petition, and the Motion to Dismiss does not challenge that conclusion. Doc. No. 4, at 2; Doc. No. 52, at 3–4. Instead, Respondents raise Section 1252(g) as a bar to relief in the hypothetical scenario where Any were to have agreed to return to the United States to participate in Respondents' plan to summarily return her to Honduras. Doc. No. 52, at 3. That has not occurred, and this Court therefore need not consider Respondents' Section 1252(g) argument.

Nonetheless, Respondents' arguments rest on a misreading of *Kong v. United States*, 62 F.4th 608, 618 (1st Cir. 2023). As in *Kong*, Any's claims challenge the basis for her detention, including the government's denial of due process, violations of 8 U.S.C. § 1231 and 8 C.F.R. § 241.4, and denial of the opportunity to post bond.  *See* Doc. No. 4, at 2; *Lopez v. Trump*, No. 25-cv-04826, 2025 WL 3274224, at *6 (S.D.N.Y. July 10, 2025) (Section 1252(g) "does not strip district courts of jurisdiction to consider habeas challenges to a noncitizen's continued detention by immigration authorities") (collecting cases); *id.* at *10 (noting that courts routinely order stays of removal in habeas cases for "petitions seeking stays of removal where the challenge is to the legality of the manner in which ICE executes the removal order."). Any's Petition thus "does not arise from the discretionary decision to execute removal but instead arises from the government's alleged violations of law in arresting [her] without a relevant warrant and in failing to abide by its own regulations," in addition to the statutory and constitutional violations set forth in the Petition. *Kong*, 62 F.4th at 618.

18

## CONCLUSION

The motion to dismiss should be denied.


Dated: March 5, 2026                    /s/ Erica L. Ross

Todd C. Pomerleau (MA BBO#664974)
Nicole Dill (MA BBO#709113)
Rubin Pomerleau, P.C.
Two Center Plaza, Suite 520
Boston, Massachusetts  02108
Tel.: (617) 367-0077
Fax: (617) 367-0071
tcp@rubinpom.com
ndill@rubinpom.com

Lee S. Wolosky (admitted *pro hac vice*)
Aaron E. Nathan (admitted *pro hac vice*)
Willkie Farr & Gallagher LLP
787 7th Avenue
New York, NY 10019
Tel.: (212) 728-8000
Fax: (323) 728-8111
lwolosky@willkie.com
anathan@willkie.com

Erica L. Ross (admitted *pro hac vice*)
Willkie Farr & Gallagher LLP
1875 K Street NW
Washington, DC 20006
Tel.: (202) 303-1000
Fax: (202) 303-2000
eross@willkie.com

19

**EXHIBIT LIST**

| Exhibit No. | Description |
|---|---|
| 1 | Declaration of Petitioner Any Lucia Lopez Belloza & Accompanying Exhibits:<br><br>*Exhibit A – Screenshots of Text Messages*<br>　　(showing text messages from Any's phone on February 26, 2026 and February 27, 2026) |
| 2 | Affidavit of Translation of Rachel Weber & Accompanying Exhibits:<br><br>*Exhibit A – Translation of Text Messages*<br>　　(showing English translation of Spanish language text messages from Any's phone on February 26, 2026 and February 27, 2026)<br><br>*Exhibit B – Screenshots of Text Messages*<br>　　(showing text messages from Any's phone on February 26, 2026 and February 27, 2026) |
| 3 | Affidavit of Todd C. Pomerleau, Esq. & Accompanying Exhibits:<br><br>*Exhibit A – Screenshot of Call Log*<br>　　(showing screenshot of outgoing call) |
| 4 | Affidavit of Nicole Dill, Esq. & Accompanying Exhibits:<br><br>*Exhibit A – ICE ERO eFile Notification*<br>　　(showing ICE ERO eFile notification at 8:25:16PM EST)<br><br>*Exhibit B – ICE ERO eFile Notification*<br>　　(showing ICE ERO eFile notification at 9:02:55PM EST)<br><br>*Exhibit C – Screenshot of ICE ERO eFile Portal*<br>　　(showing ICE ERO eFile Portal) |

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document will be electronically served on all parties through the Court's CM/ECF system.

Date: March 5, 2026　　　　　　　　　　　*/s/ Erica L. Ross*

　　　　　　　　　　　　　　　　　　　　Erica L. Ross

20